IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIP F. SHARP,                        :
                                         :
            Plaintiff,                   :
                                         :
    v.                                   : Civil Action No. 06-006-JJF
                                         :
MICHAEL J. ASTRUE[1],                    :
Commissioner of Social                   :
Security,                                :
                                         :
            Defendant.                   :
                                         :
                                         :

_____

Steven L. Butler, Esquire of THE LAW OFFICES OF GARY C.
LINARDUCCI, New Castle, Delaware.
Attorney for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, and David F.
Chermol, Esquire, Special Assistant United States Attorney, of
the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.
Of Counsel: Donna L. Calvert, Esquire, Regional Chief Counsel,
and Kathleen Hogan, Esquire, Assistant Regional Counsel of the
SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.
Attorneys for Defendant.

_____

**MEMORANDUM OPINION**

February 26, 2008
Wilmington, Delaware

_____

[1]    On February 12, 2007, Michael J. Astrue became the
Commissioner of Social Security.  Accordingly, pursuant to Fed.
R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the
former Commissioner JoAnne B. Barnhart.

Farnan, District Judge.

Presently before the Court is an appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c), filed by Plaintiff, Phillip F. Sharp, seeking review of the final administrative decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and XVI, respectively, of the Social Security Act.  42 U.S.C. §§ 401-433, 1381-1383f.  Plaintiff has filed a Motion For Summary Judgment (D.I. 6) requesting the Court to enter judgment in his favor.  In response to Plaintiff's Motion, Defendant has filed a Cross-Motion For Summary Judgment (D.I. 8) requesting the Court to affirm the Commissioner's decision.  For the reasons set forth below, Defendant's Motion For Summary Judgment will be granted and Plaintiff's Motion For Summary Judgment will be denied.  The decision of the Commissioner dated August 23, 2005, will be affirmed.

## BACKGROUND

### I.  Procedural Background

Plaintiff filed an application for DIB and SSI on August 13, 2003, alleging a disability onset date of March 11, 2003, due to herniated discs, bipolar disorder, asthma, sleep apnea and a right foot injury.  (Tr. 50-52, 63, 260-262).  The application was denied initially and upon reconsideration.  (Tr. 39-43, 46-

1

48, 264, 266-270).  Thereafter, Plaintiff requested a hearing
before an administrative law judge (the "A.L.J.").  On August 23,
2005, the A.L.J. issued a decision denying Plaintiff's
applications for DIB and SSI.  (Tr. 11-24).  Following the
unfavorable decision, Plaintiff filed a timely Request For Review
Of Hearing Decision/Order.  (Tr. 10).  On November 8, 2005, the
Appeals Council denied Plaintiff's request for review (Tr. 6-9),
and the A.L.J.'s decision became the final decision of the
Commissioner.  Sims v. Apfel, 530 U.S. 103, 107 (2000).

After completing the process of administrative review,
Plaintiff filed the instant civil action pursuant to 42 U.S.C. §§
405(g) and 1383(c), seeking review of the A.L.J.'s decision
denying his claims for DIB and SSI.  In response to the
Complaint, Defendant filed an Answer (D.I. 3) and the Transcript
(D.I. 11) of the proceedings at the administrative level.

Thereafter, Plaintiff filed a Motion For Summary Judgment
and Opening Brief in support of the Motion.  In response,
Defendant filed a Cross-Motion For Summary Judgment and a
combined opening brief in support of his Cross-Motion and
opposition to Plaintiff's Motion requesting the Court to affirm
the A.L.J.'s decision.  Plaintiff waived his right to file a
Reply Brief.  (D.I. 10).  Accordingly, this matter is fully
briefed and ripe for the Court's review.

## II.   Factual Background

### A.   Plaintiff's Medical History, Condition and Treatment

At the time of the A.L.J.'s decision on Plaintiff's applications, Plaintiff was forty-nine years old. (Tr. 15, 50, 260). Plaintiff has a high school education and past relevant work as a street sweeper, assistant manager and cashier. (Tr. 64).

Plaintiff treated with Dilipkumar Joshi, M.D. from July 2003 through August 2005. (Tr. 136-143, 226-245, 258-259). Plaintiff's treatment with Dr. Joshi began while he was an inpatient in a detoxification program at the Recovery Center of Delaware. Upon his release from the Recovery Center, Dr. Joshi evaluated Plaintiff and noted his history of drug and alcohol abuse. Plaintiff reported to Dr. Joshi that he was doing well, but that he was under stress, did not have a job and that being home was making him more depressed. Plaintiff also reported that he suffered from mood swings, difficulty sleeping, and nighttime wakings. During the evaluation, Dr. Joshi reported that Plaintiff was cooperative, pleasant, alert and oriented in all three spheres. Plaintiff did not have mood swings at the time of his evaluation, and his thoughts were logical and goal directed. Dr. Joshi diagnosed Plaintiff with bipolar disorder type II, polysubstance, and depression. (Tr. 141). Dr. Joshi also opined that Plaintiff had a global assessment of functioning ("GAF")

3

score of 65. (Tr. 141). Dr. Joshi prescribed an increased dose of Zyprexa and also Trileptal and Zoloft. Plaintiff had been taking Lexapro, but it was stopped because Plaintiff reported that it wasn't working.

In August 2003, Plaintiff also treated with David Jezyk, M.D. (Tr. 114-135). Plaintiff reported that he had increased "reflux" and was prescribed Nexium which had given him "good results" in the past. Plaintiff also wanted to discuss his diagnosis of Hepatitis C, which had been given the year before. (Tr. 122-123). Plaintiff also reported that he had been accepted into the Limon House due to his alcohol and cocaine use, had suffered a herniated disc from a car accident ten years ago and had sleep apnea for which he was supposed to use a "pump." (Tr. 122). Plaintiff was referred to a hepatologist in connection with his positive HCV test.

In August 2003, Plaintiff did not keep his appointment with Dr. Joshi, but returned to him on September 2, 2003. At that time, Plaintiff reported that his sleep was disturbed. (Tr. 137). Plaintiff reported to Dr. Joshi again on September 23, 2003, and reported that he was stable and that his primary care physician, Dr. Jezyk informed him that his lab work was normal. (Tr. 138).

On September 25, 2003, Plaintiff treated with Stacey Mandichak, MS, PA-C. Plaintiff reported that he was diagnosed

4

with Hepatitis C in 2001, but never received any follow-up care.
(Tr. 147). Plaintiff had normal liver enzymes, but complained of
fatigue, myalgias and arthralgias. Plaintiff denied abdominal
pain, pruritus, bleeding tendencies, anorexia and any history of
jaundice, tea-colored urine or alcoholic stools. Ms. Mandichak
diagnosed Plaintiff with chronic hepatitis C, genotype 2; bipolar
disorder and GERD. (Tr. 148). Following his visit with Ms.
Mandichak, Plaintiff underwent an ultrasound. The ultrasound
showed a normal appearing liver, with no evidence of any hepatic
masses and an enlarged spleen. (Tr. 146).

In October 2003, Plaintiff followed-up with Ms. Mandichak.
Plaintiff was found to have normal iron saturation, normal
coagulation studies, normal ANA, no antibody to hepatitis A or B,
and normal ATP and ferritin. (Tr. 145). Ms. Mandichak discussed
with Plaintiff a liver biopsy versus empiric treatment, but
Plaintiff wasn't sure that he wanted to proceed in either
direction. He indicated that he would prefer to proceed with
treatment, but was unsure if he could take it while at the Limon
House. (Tr. 145).

Plaintiff skipped another appointment with Dr. Joshi in
October 2003, but at a subsequent October appointment, he
reported that he was doing better and was stable. (Tr. 136). In
November 2003, Plaintiff reported that he suffered from mood
swings and was still getting irritable and agitated. (Tr. 239).

In December 2003, Plaintiff again reported that he was doing good and was stable. (Tr. 239).

In December 2003, Plaintiff reported to Donald Morgan, M.D. for a consultative examination. Dr. Morgan noted that neck, and back percussion tenderness was present variably over Plaintiff's lumbar spine and cervical spine. However, Plaintiff's straight leg test was negative. Plaintiff also had tenderness over the left medial joint line with variable tenderness over the lower patella, but there was no instability. (Tr. 153-154). The remainder of Plaintiff's joint examination was unremarkable. Dr. Morgan noted that Plaintiff's gait was a little stiff, but otherwise intact. (Tr. 154). Plaintiff was able to walk heel/toes tandem well and had 5/5 strength in his upper and lower extremities. Plaintiff's sensory was "intact to pin and fine touch," although a "fine tremor" was present when his hands were outstretched. (Tr. 153-154). Dr. Morgan noted that Plaintiff dressed and undressed without difficulty, was able to get in and out of the chair and on and off the table and assume the sitting and supine positions. (Tr. 154). Dr. Morgan diagnosed Plaintiff with a history of bipolar disorder, multi-substance abuse, obstructive sleep apnea by history, obesity, knee pain, musculoskeletal with a questionable medial meniscus tear, chronic cervical radiculopathy with history multi-level herniated nuclei pulposi; asthma by history, GERD by history, Hepatitis C, and

6

arthralgias. (Tr. 154). Dr. Morgan also prepared a range of motion chart and noted that Plaintiff had full range of motion in all areas. (Tr. 155-158).

In December 2003, Vinod Kataria, M.D. prepared a residual functional capacity assessment ("RFC") for Plaintiff. He opined that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand/walk about six hours and had unlimited push/pull abilities. Dr. Kataria also opined that Plaintiff had occasional postural limitations and should avoid extreme cold, machinery and fumes. Dr. Kataria determined that Plaintiff had the RFC for light work. (Tr. 159-167).

Also in December 2003, Janet Brandon, Ph.D. prepared a Psychiatric Review Technique Form ("PRTF") for Plaintiff and opined that Plaintiff had affective disorders and substance addiction disorders that did not meet or equal any of the listed impairments. (Tr. 168-181). Dr. Brandon opined that Plaintiff had mild restrictions of daily living, mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration. (Tr. 178). Dr. Brandon also prepared an RFC and opined that Plaintiff was moderately limited in five mental work areas, specifically, the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to

7

maintain attention and concentration for extended periods of time; the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make independent plans. Plaintiff was found to be not significantly limited in the fifteen other areas assessed. (Tr. 182-183). Dr. Brandon further noted that Plaintiff was in recovery from substance abuse, and his condition was stable through medical management. (Tr. 184).

Plaintiff also treated with Elliot H. Leitman, M.D. from December 2003 through June 2004. (Tr. 188-190, 251-253). On December 22, 2003, Plaintiff complained of left knee pain, swelling and occasional instability. (Tr. 188). Plaintiff had a moderate left knee effusion and walked with a slightly antalgic gait. Plaintiff's x-rays were reviewed and showed minimal degenerative changes and no fractures or dislocation. Plaintiff was instructed to undergo an MRI. On December 29, 2003, Plaintiff returned to Dr. Leitman reporting left knee pain. He had moderate effusion, but no objective instability in his knee and no joint line tenderness. A repeat aspiration of his knee was performed and he was asked to return in six weeks for reassessment.

8

Plaintiff also treated with Bernard Haimowitz, M.D. for Hepatitis C in December 2003. (Tr. 250). Dr. Haimowitz noted that Plaintiff had baseline problems with fatigue and sleeping related to his sleep apnea. However, Plaintiff did not use his BIPAP mask. Dr. Haimowitz scheduled a liver biopsy.

Plaintiff returned to Dr. Leitman in January 2004. Dr. Leitman assessed Plaintiff with left knee pain and swelling. (Tr. 251-255). An MRI of Plaintiff's knee showed a complex tear of the posterior horn of the medial meniscus and small to moderate joint effusion. (Tr. 256-257). Plaintiff also reported to Dr. Joshi in January 2004 and reported that he was still depressed.

In February 2004, Plaintiff underwent a left knee arthroscopy with partial medial meniscectomy. (Tr. 254). In March 2004, Dr. Leitman noted that Plaintiff returned to normal work activities, but complained of swelling and pain in his left knee. Dr. Leitman noted marked knee effusion and Plaintiff was instructed to continue his stretching and strengthening exercises.

In March 2004, Plaintiff reported to Dr. Joshi again and informed him that he was doing better, but that he became sleepy during AA meetings. Otherwise, he reported he was stable, had no anxiety and no mood swings. (Tr. 237-238). Plaintiff also reported to Dr. Haimowitz for a follow-up visit in March 2004.

9

Plaintiff's liver biopsy showed grade 1-2 fibrosis, and Plaintiff
had vague upper quadrant discomfort. (Tr. 236, 246-247). The
ultrasound revealed no pathology, and Plaintiff's pain was not
worsening. Dr. Haimowitz stressed to Plaintiff that he must
avoid alcohol. Dr. Haimowitz also opined that Plaintiff's upper
quadrant discomfort was "unclear." (Tr. 236).

In March 2004, Dr. Kataria prepared a second RFC assessment
for Plaintiff. He opined that Plaintiff could occasionally
lift/carry twenty pounds, frequently lift/carry ten pounds and
stand/walk/sit for six hours. Dr. Kataria opined that Plaintiff
had limited push/pull abilities in his lower extremities due to
his knee instability. He also opined that Plaintiff had
occasional postural limitations and should never climb ladders,
ropes or scaffolds. Dr. Kataria found no environmental
limitations. (Tr. 193, 195).

In April 2004, a second PRTF was prepared by a second
doctor, Pedro M. Ferreira, PH.D. Dr. Ferreira opined that
Plaintiff had affective disorders that did not meet or equal a
listed impairment. (Tr. 199-212). Dr. Ferreira's assessment was
virtually identical to Dr. Brandon's assessment, except that in
his RFC, Dr. Ferreira also found that Plaintiff was moderately
limited in his ability to accept instructions and respond
appropriately to criticism from his supervisors. (Tr. 213-214).

10

In April 2004, Plaintiff reported to Dr. Joshi and indicated that he felt depressed. In May 2004, he reported difficulty completing his duties at the halfway house. With respect to his knee, Plaintiff reported to Dr. Leitman that he had continued swelling, but his pain was minimal and he had no locking or instability. (Tr. 251).

In June 2004, Plaintiff reported to Dr. Joshi that he was more angry and depressed than previously. (Tr. 234-235). He was also seen by Dr. Leitman, who advised Plaintiff that he might need repeat arthroscopy. (Tr. 352). Plaintiff was also treated by Douglas A. Palma in June 2004, for his knee pain. Dr. Palma noted that Plaintiff had a knee scope for a partial medial meniscectomy, and that he had fallen three weeks earlier. Plaintiff had full range of motion in his left hip, and zero to 90 degree range of motion with a moderate sized effusion in his left knee. Plaintiff had global tenderness to the knee and a 2+ positive drawer. (Tr. 249). Dr. Palma found Plaintiff to be otherwise neurologically intact distally in the left lower extremity. Dr. Palma diagnosed Plaintiff with left knee pain, and an "old PCL" instability. He recommended icing the knee and range of motion and quad strengthening exercises. (Tr. 249).

In July 2004, Plaintiff returned to Dr. Joshi and reported that he was not sleeping well, was still anxious and had mood swings. (Tr. 234). In August 2004, Plaintiff reported no

11

complaints, but in September 2004, he indicated that he was
suffering from sleep problems, anger and agitation.  (Tr. 233).
In October 2004, Plaintiff reported that he was doing "good," and
he continued to improve in November 2004, although Plaintiff
reported angry feelings at one point during November 2004.  (Tr.
228, 233).  In December 2004, Plaintiff reported that he was
still tired and was advised to reduce his Neurontin.  (Tr. 228).
In January 2005, Plaintiff wanted to discontinue Zoloft due to
side effects he was experiencing.  (Tr. 227).  In February 2005,
Plaintiff had no complaints and indicated that he was "doing
good" and had a new job.  In March and April 2005, Plaintiff
reported feelings of sadness and depression.  (Tr. 226).

In March 2005, Dr. Joshi completed a mental impairment
questionnaire for Plaintiff.  (Tr. 241-245).  Dr. Joshi opined
that Plaintiff had a current GAF score of 75, bipolar II
disorder, and polysubstance dependence in remission.  (Tr. 241).
Dr. Joshi identified Plaintiff's signs and symptoms as mood
disturbance and emotional liability, but no clinical findings
were noted to support these symptoms.  Dr. Joshi indicated that
Plaintiff was mentally competent and had no mental impairment.
Dr. Joshi also opined that Plaintiff was stable and his prognosis
was fair.  (Tr. 242).  He anticipated that Plaintiff's
impairments would never cause him to be absent from work and
opined that Plaintiff had fair ability in seventeen work areas,

12

and poor or no ability in the following areas: the ability to sustain routine without special supervision, to work in coordination or proximity to others without being unduly distracted, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to deal with normal work stress, the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to set realistic goals or plans independently of others, and the ability to deal with stress of semiskilled and unskilled work. Dr. Joshi also opined that Plaintiff had slight restrictions of daily living activities, slight difficulties maintaining social functioning, seldom had deficiencies of concentration, persistence or pace, and had one or two episodes of decompensation. (Tr. 244). Dr. Joshi noted that Plaintiff had chronic back problems and limitations on his ability to work. (Tr. 245).

In August 2005, Dr. Joshi sent a letter to Plaintiff's counsel in response to counsel's inquiry about Plaintiff's mental impairment questionnaire. (Tr. 258). Dr. Joshi stated his opinion that Plaintiff had a GAF of 75 on March 3, 2005, but that when Plaintiff was manic or depressed his GAF score dropped to a 50. Dr. Joshi also clarified that when he used the term "mentally competent" he meant that Plaintiff's memory was not impaired and that the term "no mental impairment" meant that

13

Plaintiff was not psychotic. In this letter, Dr. Joshi opined that Plaintiff could not work more than 4 hours per day, three days per week, even in a low stress environment. (Tr. 258).

After the A.L.J. rendered his decision, Plaintiff submitted further documentation to the Appeals Council showing that he underwent, on August 25, 2006, a left knee arthroscopy with partial medial meniscectomy and left knee chondroplasty patella with lateral retinacular release. (Tr. 274-275).

B.  The A.L.J.'s Decision

At the hearing, Plaintiff was represented by counsel. Plaintiff testified that he drives, but that he wouldn't drive far distances and that he has some shaking that affects his driving. (Tr. 280). Plaintiff testified that he has pain in the back of his neck which shoots down his right arm into his hand and his hand goes numb. (Tr. 288). Plaintiff testified that he has lower back pain that is particularly bothersome when he is sitting and knee pain. Plaintiff testified that he is also being treated for bipolar disorder, suffers from headaches lasting several hours at a time and is being treated for Hepatitis C. Plaintiff also testified that he might be able to handle a simple job like that of a security guard, and that he was, in fact, getting ready to apply for such a job. (Tr. 293). Plaintiff testified that he has difficulty dealing with stress and that he gets angry or cries. (Tr. 294). Plaintiff also testified that

14

he does not have trouble going to the store or going to the doctor's office.  (Tr. 295).  According to Plaintiff he can lift ten to fifteen pounds, stand for a half hour at most, and sit for two hours at a time before needing to get up and walk around. (Tr. 300).

The A.L.J. then consulted a vocational expert.  (Tr. 304). The A.L.J. asked the vocational expert to assume a person 47 years old at his onset date with a twelfth grade education and past relevant work similar to Plaintiff's.  The A.L.J. also asked the vocational expert to consider an individual with Hepatitis C, seasonal allergies, sleep apnea, obesity, bipolar and depression with moderate mood swings, some left knee problems and neck problems with degenerative disk disease that causes some moderate pain and discomfort that is somewhat relieved by medication.  In addition, the A.L.J. asked the vocational expert to limit jobs to a maximum sit/stand every 30 to 40 minutes, low stress, low concentration, simple and unskilled duties with little or no climbing, balancing or stooping.  In response to this question, the vocational expert opined that such an individual could perform sedentary, unskilled jobs, including such positions as (1) assembly worker of which there 250 locally and 75,000 nationally that would include a sit/stand option; (2) inspector tester of which there were 400 positions locally and 75,000 nationally that would include a sit/stand option; (3) security

15

monitor position of which there would be 600 positions locally and 95,000 nationally; (4) sorter, inspector with 200 positions locally and 5,500 nationally; (5) machine feeder with 225 locally and 60,000 nationally; and (6) light assembler with 500 positions locally and 80,000 nationally. (Tr. 303-308).

In response to questions by Plaintiff's attorney, the vocational expert acknowledged that the identified jobs could not be performed by a person who has poor to no ability to sustain an ordinary work routine without supervision or by a person with poor to no ability to accept instruction or respond to criticism from supervisor. The vocational expert also admitted that a person who was unable to deal with normal work stress would be unable to perform any of the identified jobs. (Tr. 308).

In his decision dated August 23, 2005, the A.L.J. found that Plaintiff's depression and bipolar disorder are severe impairments, but they did not meet or equal, alone or in combination, a listed impairment. (Tr. 23). The A.L.J. also concluded that Plaintiff's testimony regarding his limitations was not fully credible. The A.L.J. then found that Plaintiff had the residual functional capacity to perform a significant range of light work, despite limitations that the work be low stress, low concentration and include a sit/stand option. Accordingly, the A.L.J. concluded that Plaintiff was not under a disability within the meaning of the Act.

16

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), findings of fact made by the Commissioner of Social Security are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Monsour Medical Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. Id. In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. Id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 555 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores

17

or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. Id.; Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

## DISCUSSION

### I.    Evaluation Of Disability Claims

Within the meaning of social security law, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." 20 C.F.R. §§ 404.1505, 416.905. In order to qualify for disability insurance benefits, the claimant must establish that he or she was disabled prior to the date he or she was last insured. 20 C.F.R. § 404.131, Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990). The

18

claimant bears the initial burden of proving disability.  20
C.F.R. §§ 404.1512(a), 416.912(a); Podeworthy v. Harris, 745 F.2d
210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations
require the A.L.J. to perform a sequential five-step analysis.
20 C.F.R. §§ 404.1520, 416.920.  In step one, the A.L.J. must
determine whether the claimant is currently engaged in
substantial gainful activity.  In step two, the A.L.J. must
determine whether the claimant is suffering from a severe
impairment.  If the claimant fails to show that his or her
impairment is severe, he or she is ineligible for benefits.
Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds
to step three.  In step three, the A.L.J. must compare the
medical evidence of the claimant's impairment with a list of
impairments presumed severe enough to preclude any substantial
gainful work.  Id. at 428.  If the claimant's impairment meets or
equals a listed impairment, the claimant is considered disabled.
If the claimant's impairment does not meet or equal a listed
impairment, the A.L.J.'s analysis proceeds to steps four and
five.  Id.

In step four, the A.L.J. is required to consider whether the
claimant retains the residual functional capacity to perform his
or her past relevant work.  Id.  The claimant bears the burden of

19

establishing that he or she cannot return to his or her past relevant work.  Id.

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy.  At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied.  Id.  Specifically, the A.L.J. must find that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity.  Id.  In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments.  At this step, the A.L.J. often seeks the assistance of a vocational expert.  Id. at 428.

## II.  Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By his Motion, Plaintiff contends that the A.L.J.'s decision is not supported by substantial evidence.  Specifically, Plaintiff contends that the A.L.J. (1) improperly applied 20 C.F.R. §§ 404.1521 and 416.921 in determining that Plaintiff's Hepatitis C and left knee impairments were not severe; (2) improperly applied 20 C.F.R. §§ 404.1529 and 416.929 in evaluating Plaintiff's credibility; and (3) improperly applied SSR 96-2P and 20 C.F.R. §§ 404.1527 and 416.927 in determining

20

that the medical opinion of Plaintiff's treating psychiatrist was not entitled to controlling weight. The Court will analyze each of Plaintiff's arguments in turn.

A.   Whether The A.L.J. Erred In Concluding That Plaintiff's Hepatitis C And Left Knee Impairment Were Not Severe

An impairment is "not severe" if it does not significantly limit a claimant's physical or mental capacity to perform basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). With regard to physical impairments, basic work activities include such activities as walking, standing, lifting, pushing, pulling, reaching, carrying or handling. A finding of severity under the regulations must be premised solely on a showing that medical factors exist which affect the plaintiff's ability to perform basic work activities. Vocational factors, such as age, education and work experience may not be considered.

Reviewing the A.L.J.'s decision in light of this criteria, the Court concludes that the A.L.J. did not err in concluding that Plaintiff's Hepatitis C and left knee impairments were not severe. Plaintiff's Hepatitis C was in remission since he became sober, and the clinical findings of his treating physician, Dr. Haimowitz, do not support a finding that Plaintiff's ability to perform basic work activities was hampered by his condition. Plaintiff underwent a liver biopsy in March 2004, which showed grade 1-2 fibrosis. Plaintiff had only "some very mild" discomfort in the right, upper quadrant and no obvious guarding,

21

rebound, organomegaly or edema. Dr. Haimowitz noted that "[t]he most important thing right now is to keep [Plaintiff] off alcohol." (Tr. 236). Nothing in Dr. Haimowitz's treatment records reflects that Plaintiff's ability to work was significantly compromised as a result of his Hepatitis C.

Similarly, treatment records regarding Plaintiff's left knee injury do not support Plaintiff's contention that his impairment was severe. In December 2003, Plaintiff underwent a consultative examination with Dr. Morgan during which he complained of knee pain. Dr. Morgan noted tenderness over Plaintiff's left medial joint line and variable tenderness over his lower patella, but Plaintiff had no instability, was able to get dressed and undressed without difficulty, and was able to get in and out of the chair and on and off the examining table without difficulty. In addition, Plaintiff had full range of motion. At the same time, Plaintiff also treated with Dr. Leitman. Dr. Leitman noted a moderate knee effusion with a slightly antalgic gait, but like Dr. Morgan, he observed no objective instability. Although Plaintiff ultimately underwent a left knee arthroscopy with partial medial meniscectomy in February 2004 and experienced some swelling and pain a month after the surgery, Dr. Leitman noted that Plaintiff had returned to his normal work activities and recommended continued stretching and strengthening exercises. In May 2004, Plaintiff had continued swelling of his knee, but

22

reported only minimal pain and no locking or instability. (Tr. 251). In June 2004, Plaintiff also treated with Dr. Palma for his knee pain. Dr. Palma noted that Plaintiff had a moderate size effusion of his knee and tenderness, 0 to 90 degree range of motion and a 2+ positive drawer. Otherwise, Plaintiff was neurologically in tact, and Dr. Palma diagnosed Plaintiff with knee pain and an "old PCL instability." Like Dr. Leitman, Dr. Palma recommended strengthening exercises.[2] Neither Dr. Leitman, Dr. Morgan, nor Dr. Palma made any findings or notations suggesting that Plaintiff's ability to perform basic work functions was compromised by his left knee impairment.

In these circumstances, the Court cannot conclude that Plaintiff met his burden of establishing that his Hepatitic C and knee impairments were severe. Accordingly, the Court concludes that the A.L.J. did not err in his step two analysis.[3]

---

[2]    Plaintiff points out that he had a second surgery on his left knee after the A.L.J. rendered his decision. Plaintiff submitted documentation regarding this surgery to the Appeals Council; however, the Court cannot consider that evidence in determining whether substantial evidence supports the A.L.J.'s decision. The evidence can be considered in the context of determining whether Plaintiff is entitled to a remand, if Plaintiff demonstrates that the evidence is "new" and "material" and "good cause" exists for his failure to present the evidence to the A.L.J. See Matthews v. Apfel, 239 F.3d 589, 593-595 (3d Cir. 2001). In this case, Plaintiff has not made any showing with regard to these elements, and therefore, the Court cannot conclude that he has satisfied the criteria for a remand.

[3]    Even though the A.L.J. concluded that Plaintiff's left knee impairment was not severe, he accommodated that impairment by limiting Plaintiff to jobs with a sit/stand option, and little

23

B.   Whether The A.L.J. Improperly Applied 20 C.F.R. §§
     404.1529 And 416.929 In Evaluating Plaintiff's
     Credibility

Although the A.L.J. must consider a plaintiff's subjective
complaints of pain, the A.L.J. has the discretion to evaluate the
plaintiff's credibility and "'arrive at an independent judgment
in light of medical findings and other evidence regarding the
true extent of the pain alleged by the claimant.'"   Gantt v.
Commissioner Social Sec., 2006 WL 3081094, *2 (3d Cir. Oct. 31,
2006) (citations omitted).   Subjective complaints alone are
insufficient to establish disability and allegations of pain must
be supported by objective medical evidence.   Id., 20 C.F.R. §§
404.1529, 416.929.   In this regard, the A.L.J. must first
determine whether the plaintiff suffers from a medical impairment
that could reasonably be expected to cause the alleged symptoms.
Once the A.L.J. makes this determination, he or she must evaluate
the intensity and persistence of the pain or symptoms, and the
extent to which they affect the individual's ability to work.
Specifically, the A.L.J. is required to consider such factors as
(1) plaintiff's daily activities; (2) the duration, location,
frequency, and intensity of the pain and other symptoms; (3) any
precipitating and aggravating factors; (4) any medication taken

_____

or no climbing, balancing or stooping.   The vocational expert was
still able to identify jobs that Plaintiff could perform.
Accordingly, the Court finds no error in the A.L.J.'s
determinations.

24

to alleviate pain or other symptoms; (5) treatments other than
medication; (6) any other measures used to relieve the symptoms;
and (7) other factors concerning functional limitations or
limitations due to pain or other symptoms.  20 C.F.R. §§
416.929(c)(3)(i)-(vii), 404.1529(c)(3)(i)-(vii).

This analysis requires the ALJ to assess the plaintiff's
credibility to determine the extent to which he or she is
accurately stating the degree of pain and/or the extent to which
he or she is disabled by it.  See 20 C.F.R. §§ 404.1529(c),
416.929(c).  Generally, the A.L.J.'s assessment of a plaintiff's
credibility is afforded great deference, because the A.L.J. is in
the best position to evaluate the demeanor and attitude of the
plaintiff. See e.g. Fargnoli v. Massanari, 247 F.3d 34, 43 (3d
Cir. 2001); Griffith v. Callahan, 138 F.3d 1150, 1152 (7th Cir.
1998); Wilson v. Apfel, 1999 WL 993723, *3 (E.D. Pa. Oct. 29,
1999).  However, the A.L.J. must explain the reasons for his or
her credibility determinations.  Schonewolf v. Callahan, 972 F.
Supp. 277, 286 (D.N.J. 1997) (citations omitted).

Reviewing the A.L.J.'s decision in light of the applicable
legal standards, the Court concludes that the A.L.J.
appropriately evaluated Plaintiff's complaints and adequately
explained his reasons for rejecting those complaints.  As the
A.L.J. noted, Plaintiff's complaints of disabling pain and
disabling impairments were contradicted by his daily activities,

as well as by the treatment records provided by his physicians.
See e.g., 20 C.F.R. §§ 404.1529(c)(3) (allowing the ALJ to
consider "all of the evidence presented, including information
about your prior work record, your statements about your
symptoms, evidence submitted by your treating or nontreating
source, and observations by our employees and other persons").
As the A.L.J. noted, Plaintiff was able to prepare meals for
fifteen people, perform household chores, dust, vacuum, mop, play
cards two to three times per week and read as a hobby. Plaintiff
was also able to go to AA meetings twice a day, visit with
relatives weekly and talk to them on the phone three to four
times per week, and get along with family, friends, neighbors and
co-workers. As the A.L.J. noted, these activities undermine
Plaintiff's allegations of total disability, inability to
concentrate and complete unemployability. See Thomas v.
Barnhart, 469 F. Supp. 2d 228, 239 (D. Del. 2007).

Plaintiff suggests that his psychiatric conditions were
uncontrolled because he had approximately fifteen changes in
medication between July 2003 and April 2005; however, nothing in
the treatment records from Plaintiff's physicians indicate that
his condition was uncontrolled. Indeed, as the A.L.J. noted,
Plaintiff had no episodes of decompensation and was never
hospitalized for his mental impairment.

Further, the A.L.J.'s credibility determination is supported by the findings of reviewing state agency psychologists and physicians. For example, Dr. Kataria determined that Plaintiff's impairments did not preclude him from performing all work, and Drs. Brandon and Ferreira, state agency psychologists, opined that Plaintiff had only mild restrictions of the activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. Dr. Brandon found moderate limitations in five mental work areas and Dr. Ferreira found moderate limitations in six mental work areas. Dr. Brandon also opined that Plaintiff had achieved stability in his condition through medical management. Neither Dr. Brandon nor Dr. Ferreira opined that Plaintiff's symptoms were severe enough to preclude him from performing all work.[4]

In sum, the Court concludes that the A.L.J. identified the correct standards for evaluating Plaintiff's credibility and his subjective complaints and appropriately applied those standards. Accordingly, the Court cannot conclude that the A.L.J. erred in

---

[4]     Plaintiff directs the Court to the opinion of his treating physician, Dr. Joshi, to support his credibility with respect to his allegation that his ability to work is significantly limited. However, for the reasons set forth in Section C. infra of this Memorandum Opinion, the Court concludes that Dr. Joshi's opinion is inconsistent and not entitled to controlling weight, and therefore, it does not serve to bolster Plaintiff's credibility.

27

finding that Plaintiff's allegations regarding his limitations were not entirely credible.

C.   Whether The A.L.J. Erred In Determining That The Opinion Of Plaintiff's Treating Psychiatrist Was Not Entitled To Controlling Weight

Although a treating physician's opinion is entitled to great weight, a treating physician's statement that a plaintiff is unable to work or is disabled is not dispositive. A plaintiff's RFC and the ultimate question of whether a plaintiff meets the statutory definition for disability are issues reserved exclusively for determination by the A.L.J.  20 C.F.R. §§ 404.1527(e)(1)-(3); 416.927(e)(1)-(3); SSR 96-5p, 1996 WL 374183, *2.  The A.L.J. must review all the evidence and may discount the opinions of treating physicians if they are not supported by the medical evidence, provided that the A.L.J. explain his or her reasons for rejecting the opinions adequately.  Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir.2001), Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).  If a treating physician's opinion is rejected, the A.L.J. must consider such factors as the length of the treatment relationship, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record evidence, any specialization of the opining physician and other factors the plaintiff raises, in determining how to weigh the physician's opinion.  20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

28

In this case, the A.L.J. declined to credit the opinions of Plaintiff's treating psychologist, Dr. Joshi, on the basis that Dr. Joshi's opinion conflicted with substantial evidence in the record, including Dr. Joshi's own documented treatment notes and observations of Plaintiff. Reviewing the record as a whole, the Court cannot conclude that the A.L.J.'s decision was erroneous. As the A.L.J. noted, Dr. Joshi's August 2005 opinion was inconsistent with his initial evaluation of Plaintiff and his progress notes which indicated that Plaintiff's condition was stable. Dr. Joshi's August 2005 opinion was also inconsistent with his March 2005 opinion, and his March 2005 opinion itself is internally inconsistent. Specifically, Dr. Joshi opined in March 2005 that Plaintiff had a GAF of 75, which is indicative of slight impairments, yet Dr. Joshi opined that Plaintiff had poor or no ability in eight different work areas. At the request of Plaintiff's counsel, Dr. Joshi attempted to clarify his March 2005 opinion with his August 2005 opinion letter. In his August 2005 opinion letter, Dr. Joshi states that Plaintiff had a GAF of 75 on March 3, 2005, but that his condition fluctuates and when Plaintiff is experiencing a manic episode his GAF is significantly lower. However, Dr. Joshi's August 2005 opinion fails to explain other inconsistencies in his original March 2005 opinion, including that Plaintiff had poor or no ability in eight work related areas, yet had only mild restrictions of daily

living, slight difficulties in maintaining social functioning and seldom deficiencies of concentration, persistence or pace. Dr. Joshi also failed to reconcile his statement that Plaintiff's condition fluctuated with his prior statement that Plaintiff's condition was stable and he would never be absent from work due to his condition.

In addition, as the A.L.J. noted, Dr. Joshi's opinion conflicts with other substantial evidence in the record, including the opinions of two state agency psychologists. See Jones v. Sullivan, 954 F.2d 125, 128-129 (3d Cir. 1991) (recognizing that a non-examining physician can provide substantial evidence to support the A.L.J.'s decision). Further, Dr. Joshi's opinions do not appear to be based upon any clinical findings as he indicated "N/A" to a question asking him to describe any clinical findings and symptoms that demonstrated the severity of Plaintiff's impairment or symptoms. In this regard, Dr. Joshi's opinions appear to be based on Plaintiff's subjective reports, rather than on objective medical findings as the A.L.J. observed.

In sum, the Court concludes that the A.L.J. identified the correct principles to be applied to the opinions of treating physicians, and the Court can discern no error in the A.L.J.'s application of those principles. The Court further concludes that the A.L.J.'s determination that Plaintiff was not disabled

is supported by substantial evidence, as discussed by the Court in the context of each of Plaintiff's arguments. Accordingly, the Court will affirm the August 23, 2005 decision of the A.L.J.

## CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment and deny Plaintiff's Motion For Summary Judgment. The decision of the Commissioner dated August 23, 2005 will be affirmed.

An appropriate Order will be entered.